IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHRISTOPHER MARK CARRIER                                                              PLAINTIFF

v.                       Civil No. 5:23-cv-05133-TLB-MEF

HEAD NURSE TRACEY ROBISON,
Turn Key Health Clinics, LLC;
SHERIFF SHAWN HOLLOWAY,
Benton County, Arkansas;
BENTON COUNTY, ARKANSAS;
TURN KEY HEALTH CLINICS, LLC;
OFFICER JOHN DOE 1-10; and
NURSE JANE DOE 1-4                                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Christoper M. Carrier ("Carrier"), filed this *pro se* civil rights action under 42 U.S.C. § 1983.  Carrier proceeds *pro se* and *in forma pauperis* ("IFP").  The claims asserted in this case arose when Carrier was incarcerated in the Benton County Detention Center ("BCDC").  Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

The case is before the Court on the Motion for Summary Judgment filed by Carrier (ECF No. 53) and the Joint Motion for Summary Judgment filed by the Benton County Defendants and the Turn Key Health Clinics, LLC, Defendants (ECF Nos. 54-56).  The parties have filed responses to the respective Motions.  (ECF Nos. 58, 65-67 & 68).  The Motions are ready for decision.

1

## I.     BACKGROUND

On October 2, 2023, Carrier filed the Second Amended Complaint currently before the Court.  (ECF No. 14).   In his first claim, Carrier alleges that on June 12, 2021, he was transported from the Washington County Detention Center ("WCDC") to the BCDC.  *Id.* at 4.   He maintains he had tested positive for COVID-19 prior to his transfer.  *Id.*   Carrier says Defendant Robison and the BCDC staff were notified of his diagnosis by both the WCDC medical and detention staff and by Carrier himself.  *Id.*   Despite his diagnosis, Carrier says he was placed in general population.  *Id.* at 4.   When Defendant Robison was making her rounds, Carrier indicates he insisted on speaking to her.  *Id.*   He told her that he had COVID-19 and she simply replied that he would not have been transported if that were true.  *Id.*   She took no action to verify the accuracy of his claim.  *Id.* at 4-5.   Carrier was able to bond out but he indicates he could have hurt others during this time.  *Id.* at 5.

Carrier alleges the conduct of the Defendants violated the policy against transporting inmates with COVID-19 and the policy requiring the quarantine of inmates testing positive for COVID-19.  (ECF No. 14 at 6).   Further, he asserts the Defendants' conduct amounted to deliberate indifference.  *Id.*

Carrier's second claim involves Carrier's exposure to MRSA.[1]  On August 2, 2022, Carrier says he was "sleeping above a fellow inmate diagnosed with MRSA."  (ECF No. 14 at 7). At the time, Carrier was a trustee.  *Id.*   Carrier indicates he informed Officers John Doe 1-3 and Nurse Doe.  *Id.*   Carrier also informed his wife who, considering Carrier's "previous health concerns," began "persistently communicating" concerns regarding his health to the Defendants.

---

1 Methicillin-resistant Staphylococcus aureus.

*Id*.

On August 31, 2022, Carrier says he was terminated as a trustee and placed in general population. (ECF No. 14 at 7). Carrier states that he was housed with four other inmates who were also diagnosed with MRSA. *Id*. Carrier indicates he complained about his housing conditions to Defendant Robison and several John Doe and Jane Doe officers and nurses. *Id*. He asked for the infected inmates to be rehoused or quarantined. *Id*. Carrier indicates he expressed his concern about his safety considering his prior health issues so much that he was threatened with disciplinary action. *Id*.

On or about September 7, 2022, Carrier had what appeared to be "an ingrown hair/pimple" that became infected. (ECF No. 14 at 8). The infection caused a "gaping" open "laceration" on his right leg. *Id*. His leg became so swollen he could hardly "fit into the facility provided stripes." *Id*. Carrier asked Nurse Jane Doe if he could be put on bed rest and she responded: "We typically don't have bed rest here." *Id*. Carrier indicates he was also denied medical supplies. *Id*. Carrier says Defendant Robison merely scoffed and argued the condition was not serious. *Id*.

Carrier was prescribed antibiotics which did not work. (ECF No. 14 at 8). Carrier says his antibiotics were changed from Amoxicillin to Augmentin without him being seen by a doctor and despite his protests that he had needed antibiotics through his PIC (peripherally inserted central catheter) line the last time he had MRSA. *Id*. Carrier was finally admitted to the hospital and diagnosed with an "advanced MRSA infection threatening life and limb." *Id*. Carrier remained in the hospital for four days and upon discharge was prescribed medication. *Id*. The prescribed medication was not provided to Carrier. Instead, he was "given Tylenol and [I]buprofen to

3

remedy post surgery pain and potential for reinfection." *Id.* Carrier spent 30 days in the medical pod but did not receive the prescribed physical therapy. *Id.*

On September 22, 2022, Carrier states he even contacted Jennifer Blakely, the social worker, maintaining he was in an emergency situation. (ECF No. 14 at 8). While they would not talk to his wife without a HIPPA release which they would not let him sign, Carrier says his wife was told they were fully aware of his prior medical history. *Id.*

In his third claim, Carrier maintains the Defendants were deliberately indifferent to his serious medical conditions which resulted in a deterioration of his health and permanent functional impairment, scarring, and disfigurement. (ECF No. 14 at 9). After he spent four days in the hospital, Carrier returned to the BCDC and was put in the medical pod on 23 hours a day lockdown. *Id.* at 10. Carrier says they did not have all his medications and his prescribed pain medication was not given to him at all. *Id.* Carrier alleges the nurses all tried to give him something else for the pain without his having been seen by the doctor or asking about allergies. *Id.* Carrier said he suffered side effects known as restless leg syndrome. *Id.* As a result, he took only Tylenol and Ibuprofen to "remedy post surgery pain and potential for re-infection." *Id.* Carrier states he spent a month locked down and in agony from the pain. *Id.* Further, Carrier indicates they did not follow the instructions of his surgeon and hospital staff. *Id.*

In his fourth claim, Carrier alleges that Benton County as the employer of the detention personnel is responsible for the acts of its employees when it knew or in the exercise of reasonable care should have known that its employees were subjecting detainees to an unreasonable risk of harm. (ECF No. 14 at 11). Carrier asserts that Benton County failed to supervise and train its officers and this was the proximate cause of his lack of treatment which amounts to reckless

4

endangerment.[2]  *Id.*

As relief, Carrier seeks the following: nominal damages; compensatory damages; and punitive damages.  (ECF No. 14 at 12).  He asks that the healthcare policies be rewritten.  *Id.* at 13.  Carrier states he should be able to afford the best healthcare for the rest of his life for what he went through.  *Id.*

## II. APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is

---

[2] Certain Defendants and claims were dismissed at the screening stage.  (ECF No. 23, Report and Recommendation; ECF No. 33, Order adopting Report and Recommendation).

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   DISCUSSION

#### A.   Carrier's Motion for Summary Judgment

Carrier's Motion (ECF No. 53) is not in compliance with Rule 56 of the Federal Rules of Civil Procedure or Rules 7.2 and 56.1 of the Local Rules for the Eastern and Western Districts of Arkansas. The Motion was not accompanied by a statement of undisputed material facts or a brief. The Motion is denied for these reasons.

#### B.   Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on the issue of exhaustion.[3] (ECF No. 54). Defendants maintain Carrier failed to exhaust his administrative remedies with respect to each of his four claims.

##### 1.   The Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the

---

3 Defendants' Motion is entitled a Motion for Partial Summary Judgment; however, they move for dismissal of all claims. (ECF No. 54).

6

administrative review process in accordance with the applicable procedural rules." *Id*. at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*. A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).

### 2. The BCDC Grievance Policy

The BCDC grievance procedure is set forth in the Inmate Handbook. (ECF No. 56-3). The "Inmate Handbook is available on the electronic kiosks, and each time an inmate utilizes a kiosk they are prompted to acknowledge that they have access to the Inmate Handbook." (ECF No. 56-2 at 2). The Inmate Handbook provides as follows:

**5) Grievance Procedure Rights**

    a) Inmates wishing to file a grievance must use the following procedure:

        i) An inmate may file an informal grievance by discussing the specific problem with a staff member. Normally these informal grievances are filed verbally with staff having contact with the inmate during routine supervision. Where and when possible, staff receiving the grievance may address the complained of condition directly. Emergency grievances, in which delay in handling could result in personal injury or other damages to the inmate, will be handled expeditiously. If not resolved at the officer level, the grievance will be passed to the Shift Sergeant for action or subsequent referral.

        ii) If the problem cannot be resolved through informal discussions or the inmate wishes to document the grievance for additional consideration, he may submit a written grievance on the kiosk.

        iii) Formal grievances are filed in writing and an inmate may ask for assistance from officers or other inmates in writing out the grievance

    on the kiosk. A problem that results from a specific event or action must be presented on the approved form within seven [7] days of the occurrence. Formal grievances will be accepted on the kiosk or, in the event they are submitted on the paper form, they may be turned into any deputy to be forwarded to a lieutenant. On a daily basis, officers conduct rounds throughout the facility giving inmates the opportunity to request a paper grievance form or address concerns. The formal grievance must:
(1) Be in writing (via the kiosk),
(2) Clearly define the situation and the facts upon which it is based,
(3) Specify the wrongful act or situation and describe the harm done,
(4) Arise out of an act or failure to act by Benton County Detention Center,
(5) Address a matter within the control of the facility,
(6) Request a remedy that is within the power of the facility to grant,
(7) Be submitted within seven [7] days of the occurrence.
(8) Specify a requested remedy.

iv) The decision will be presented to the inmate in writing, no later than fifteen [15] days after the grievance is received. Inmates will be provided with meaningful relief of a substantiated grievance, i.e., reinstatement of good time, additional visitation privileges. To prevent reprisals against an inmate, disciplinary action may be taken against any staff member who retaliates or attempts to retaliate against an inmate filing a grievance.

v) Inmates may be disciplined for filing frivolous or repeated grievances that consistently have little or no merit.

vi) Appeal of a grievance decision is made to the Captain on the same grievance form or format. The Captain has fifteen [15] days from the date the grievance is received to respond, and the decision of the Captain is final.

vii) The facility will maintain records of all grievances filed by an inmate for at least five years after the inmate has left or been released from the facility. Grievance information regarding inmates and employees will be kept strictly confidential. In no case will information be released without the specific approval of the Captain or designee.

(ECF No. 56-3 at 4-5).

### 3. Application to Carrier's Claims

Defendants maintain that Carrier cannot prove that he exhausted his administrative remedies with respect to any of his claims. (ECF No. 54). First, Defendants argue that Carrier did not file a single grievance related to the following claims: (1) his claim that he was transported with COVID-19; (2) the claim that Defendants housed inmates, including him, in general population when they had tested positive for COVID-19; (3) his being housed with inmates who had MRSA infections; (4) the alleged failure to supervise and train officers on how to care for sick inmates. Second, Defendants argue that Carrier did not appeal his grievances on the following claims: (1) his being housed in general population even though he had MRSA; (2) Defendants were deliberately indifferent to his leg injury and infection; and (3) Defendants failed to provide adequate post-surgery care.

#### a. Verbal Grievances

Carrier first argues that he made verbal grievances regarding all his claims—many on an emergency basis. He contends the grievance policy clearly recognizes the use of verbal grievances. Carrier argues his verbal grievances coupled with the fact that the Inmate Handbook provides that "[m]edical staff will make all medical decisions" means he satisfied the grievance procedure.

The Court agrees with Carrier on this. The policy clearly contemplates the use of verbal grievances. It then provides that a detainee who is unsatisfied with the response "may" file a written grievance. The use of the word "may" indicates the step is permissive.[4] Use of the

---

4 May is defined as to "have permission to." https://unabridged.merriam-webster.com/unabridged/may (last accessed June 14, 2024).

written grievance procedure is not mandatory under the grievance procedure.

### b. No Appeal

The policy also provides that an appeal "is made" to the Captain. Nothing about the wording suggests this step is mandatory. While exhaustion generally requires the following of each step of a grievance plan set forth by the detention center, detainees must follow only such steps as are required to be taken under the plan. The plan language could have clearly set forth a mandatory three step process involving verbal grievances, written grievances, and an appeal—but it does not. Carrier was not required to take steps that were merely permissive under the plan.

### IV. CONCLUSION

For the reasons discussed above, it is recommended that:

(1) Carrier's Motion for Summary Judgment (ECF No. 53) be **DENIED** as not in compliance with the Federal Rules of Civil Procedure or the Local Rules of this Court; and,

(2) Defendants' Joint Motion for Summary Judgment on exhaustion grounds (ECF No. 54) be **DENIED**.

**Status of the Referral: This case should remain referred for all matters not recommended for dismissal in this Report and Recommendation.**

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of June 2024.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE